Case 1:13-cv-01995-RBJ-MEH   Document 1   Filed 07/26/13   USDC Colorado   Page 1 of 10

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Civil Action No. _____

ASHLEY MOSER,

    Plaintiff,

v.

CINEMARK HOLDINGS, INC., a Delaware corporation; CINEMARK USA, INC., a Texas corporation; and CENTURY THEATRES, INC., a California corporation,

    Defendants.

## COMPLAINT AND JURY DEMAND

Plaintiff Ashley Moser, through counsel, submits the following Complaint and Jury Demand:

### JURISDICTION AND VENUE

1. Plaintiff Ashley Moser is, and at all pertinent times was, a resident of the City and County of Denver, Colorado.

2. Defendant Cinemark Holdings Inc. ("Cinemark Holdings") is, and at all pertinent times was, a Delaware corporation with its headquarters in Plano, Texas.

3. Defendant Cinemark USA, Inc. ("Cinemark USA") is, and at all pertinent times was, a Texas corporation with its headquarters in Plano, Texas.

4. Defendant Century Theatres, Inc. ("Century") is, and at all pertinent times was, a California corporation with its headquarters in Plano, Texas.

5. This action is between citizens of different states, and the amount in controversy exceeds the sum of $75,000.00, exclusive of costs and interest; therefore, this Court has jurisdiction pursuant to 28 U.S.C. §1332.

6. A substantial part of the events or omissions giving rise to this claim occurred in the District of Colorado; therefore, venue is proper under 28 U.S.C. § 1391(b)(2).

<u>FIRST CLAIM FOR RELIEF</u>

(Premises Liability under C.R.S. 13-21-115)

7. Plaintiff incorporates by reference into this First Claim for Relief all prior allegations made in this Complaint.

8. On or about July 20, 2012, Plaintiff and her daughter Veronica attended the midnight premier of "The Dark Knight Rises" in Auditorium 9 of the Century 16 theater complex in Aurora, Colorado.

9. Cinemark Holdings was at all pertinent times a "landowner" of the Century 16 theater complex, as that term is used in C.R.S. 13-21-115 (the Premises Liability Act).

10. Cinemark USA was at all pertinent times a "landowner" of the Century 16 theater complex, as that term is used in the Premises Liability Act.

11. Century was at all pertinent times a "landowner" of the Century 16 theater complex, as that term is used in the Premises Liability Act.

12. During the midnight premier, the Defendants allowed a ticketed customer seated inside Auditorium 9 to (a) prop open the door leading directly from the inside of Auditorium 9 to the

back parking lot; (b) leave the theater and spend considerable time arming himself from an arsenal of weapons that were in his car parked near the door; and (c) re-enter Auditorium 9 through the propped-open door carrying his arsenal of weapons. (This customer will be referred to as "the gunman.")

13. After the gunman re-entered Auditorium 9 through the propped-open door, undetected and undeterred, the gunman opened fire on the other ticketed patrons in the theater, killing or wounding many of them.

14. Plaintiff's daughter Veronica was shot and killed by the gunman, as was Plaintiff's unborn child, and Plaintiff was shot and permanently paralyzed by the gunman.

15. At the time they attended the midnight premier of "The Dark Knight Rises," Plaintiff and her daughter Veronica were the Defendants' "invitees" under the Premises Liability Act.

16. Under the Premises Liability Act, the Defendants owed a duty to the Mosers to exercise reasonable care to protect them against dangers of which the Defendants knew or should have known.

17. As of July 20, 2012, the Defendants knew or should have known there was a danger that a customer or customers at the Century 16 theater complex might be subjected to a violent act on the premises.

18. As of July 20, 2012, the Defendants knew or should have known that violent acts had been committed numerous times at other theaters, including without limitation:

   a. A 2003 shooting and armed robbery that took place at a Woodbury, Pennsylvania movie theater, involving a plot where one of the perpetrators inside the theater let her armed accomplices into the theater through a side door.

    b.    A 2006 shooting that took place at a Baltimore, Maryland movie theater, where a mentally ill man shot the patron sitting in front of him after telling everyone else in the theater to get down;

    c.    A 2006 shooting that took place in the lobby of a Pittsburg, Pennsylvania movie theater;

    d.    A 2008 armed robbery that took place at a State College, Pennsylvania movie theater during a showing of "The Dark Knight;"

    e.    A 2008 shooting that took place at a Philadelphia, Pennsylvania movie theater;

    f.    A 2008 robbery and murder that took place at a Raleigh, North Carolina movie theater;

    g.    A 2009 armed robbery that took place at a Shallotte, Georgia movie theater;

    h.    A 2009 armed robbery that took place at a Spokane, Washington movie theater;

    i.    A 2009 armed robbery that took place at a Sacramento, California movie theater, during which two female moviegoers were robbed at knifepoint inside the theater;

    j.    Two 2010 armed robberies that took place at a Glendale, Arizona movie theater, during which the robbers wore Halloween masks;

    k.    A 2010 armed robbery that took place in the parking lot of a Tulsa, Oklahoma movie theater;

    l.    A 2010 armed robbery that took place at an Appleton, Wisconsin movie theater;

    m.    A 2010 armed robbery that took place at a Galveston, Texas movie theater;

    n.    A 2010 armed robbery that took place at a Boston, Massachusetts movie theater, during which the robber jumped on a counter and threatened to shoot everyone in the theater;

    o.    A 2010 stabbing that took place at a Lancaster, California movie theater;

    p.    A 2010 shooting that took place outside a Daly City, California movie theater;

    q.   A 2010 armed robbery that took place at a Philadelphia, Pennsylvania movie theater, during which two persons were shot;

    r.   A 2010 armed robbery that took place at a Shaker Heights, Ohio movie theater, during which five theater patrons were assaulted and robbed at 11 p.m. on a Tuesday night, while they were inside one of the theaters watching a movie;

    s.   A 2011 armed robbery that took place at a Concord, California movie theater;

    t.   A 2011 armed robbery that took place at a Willoughby Hills, Ohio movie theater;

    u.   A 2011 armed robbery that took place at a Mobile, Alabama movie theater;

    v.   A 2011 armed robbery that took place in the parking lot of a Valley Stream, New York movie theater;

    w.   A 2011 armed robbery that took place at an Appleton, Wisconsin movie theater;

    x.   A 2011 armed robbery that took place at a Potomac Mills, Virginia movie theater, in which two teenage moviegoers were robbed inside one of the theaters;

    y.   A 2011 shooting that took place in the parking lot of a Tuscaloosa, Alabama movie theater;

    z.   A 2012 armed robbery that took place in the lobby of a Bluefield, West Virginia movie theater;

19.   Prior to July 20, 2012, in response to the foreseeable danger of criminal activity at the Century 16 theater complex, the Defendants would regularly hire security personnel, including armed, uniformed, off-duty Aurora police officers, on weekend nights.

20. But, for the midnight premier of "The Dark Knight Rises," the Defendants hired no security personnel at all, even though the Defendants knew that a very large crowd was expected for the well-publicized midnight premier.

21. The evening of the attack, before entering Auditorium 9 as a ticketed patron for the midnight premier, the gunman conducted surveillance in the lobby of the theater complex, looking for the presence of security personnel.

22. The gunman would not have gone forward with his attack on the Century 16 theater complex if he had seen armed security personnel at the theater complex that night.

23. Prior to July 20, 2012, also in response to the foreseeable danger of criminal activity, the Defendants placed surveillance cameras at its Century 16 theater complex, but only in locations designed to protect its employees and property from foreseeable criminal activity.

24. Prior to July 20, 2012, the Defendants chose not to place surveillance cameras in locations designed to protect its customers from foreseeable criminal activity, such as over the back door to Auditorium 9; therefore, the gunman was able to use the back door to Auditorium 9 to commit his attack, without being detected.

25. Prior to July 20, 2012, also in response to the foreseeable danger of criminal activity, the Defendants had alarmed the door leading from the back parking lot to a projection booth in a different auditorium than Auditorium 9.

26. But, the Defendants chose not to similarly alarm the back door to Auditorium 9 prior to July 20, 2012; therefore, the gunman was able to use the back door to Auditorium 9 to commit his attack, without being detected.

27. On three separate occasions prior to July 20, 2012, the gunman conducted at least three separate surveillance missions inside the Century 16 theater complex in preparation for his attack, during which he took numerous photographs of the complex, including photographs of one of the back doors and its hinges.

28. As a result of these pre-July 20 surveillance missions, the gunman learned that there was no surveillance camera over the back door to Auditorium 9 and no alarm on the back door to Auditorium 9. One of the reasons the gunman chose this particular theater complex as the place for his attack was that he could use the back door to leave and re-enter Auditorium 9 carrying an arsenal of weapons, without being detected.

29. Prior to the attack, the Defendants knew or should have known that the FBI had issued a press release on May 1, 2012, that put the Defendants and others on notice that movie theaters in the United States might be the target of high casualty attacks using heavy weapons such as the AK-47 and PK machine gun.

30. The Defendants' own written security and safety rules in effect as of July 20, 2012, required theater personnel to be on the lookout for persons acting suspiciously, including persons who appeared to be "casing" the theater, and to confront such persons and report them, because this might deter such persons from committing a crime at the theater.

31. The Defendants knew or should have known about the gunman's surveillance activities prior to July 20, 2012 and knew or should have known that these surveillance operations indicated that the gunman may be planning an attack against the theater and may be planning to use a back door of the theater complex as a means of accessing one of the theaters to commit his attack.

32. Prior to the gunman's attack, the Defendants did not take any action with respect to the gunman's surveillance activities at the Century 16 theater complex, either before or on July 20, 2012.

33. In the following respects, and in any other respect shown by the evidence, the Defendants failed to exercise reasonable care to protect the Mosers from the foreseeable danger of a violent act being committed on the premises:

   a. The Defendants failed to have adequate security and customer-safety policies, practices, and procedures in place at its Century 16 theater complex as of July 20, 2012.

   b. The Defendants unreasonably failed to hire security personnel to be present for the midnight premier of "The Dark Knight Rises;"

   c. The Defendants unreasonably failed to install surveillance cameras in locations designed to protect its customers from foreseeable criminal activity, such as over the back door to Auditorium 9;

   d. The Defendants unreasonably failed to design, construct, and alarm the door leading directly from the inside of Auditorium 9 to the outside parking lot in such a manner as to (a) prevent persons from entering or re-entering the theater through the door, and/or (b) warn theater personnel whenever the door is opened; and

   e. The Defendants unreasonably failed to take any action with respect to the gunman's surveillance activities at the Century 16 theater complex before or on July 20, 2012.

34. As a direct result of the Defendants' breach of their statutory duty to exercise reasonable care to protect the Mosers against a danger of which the Defendants knew or should have known, Plaintiff suffered serious and permanent bodily injuries, and sustained the following

past and future damages in a sum to be determined by the jury: physical impairment; disfigurement; reasonable and necessary healthcare expenses; loss of earnings; impairment of her ability to earn money in the future; physical and mental pain and suffering; inconvenience; emotional stress; and impairment of the quality of her life.

WHEREFORE, Plaintiff Ashley Moser prays for judgment against the Defendants, jointly and severally, for actual damages in a sum to be determined by the jury, interest at the maximum rate allowed by law from and after July 20, 2012, and for costs to the maximum extent permitted by law.

## SECOND CLAIM FOR RELIEF

(Wrongful Death under C.R.S. 13-21-201, et seq.)

35. Plaintiff incorporates into this Second Claim for Relief all prior allegations made in this Complaint.

36. The Defendants' breach of their statutory duty to exercise reasonable care to protect against dangers of which the Defendants knew or should have known caused the wrongful death of Plaintiff's beloved, young daughter, Veronica Moser.

37. As a direct result of the wrongful death of her daughter, Plaintiff has sustained the following damages in a sum to be determined by the jury: grief; loss of companionship; impairment of the quality of life; pain and suffering; emotional stress; reasonable funeral, burial, internment, or cremation expenses; and any net economic loss suffered by Plaintiff.

WHEREFORE, Plaintiff Ashley Moser prays for judgment against the Defendants, jointly and severally, for actual damages in a sum to be determined by the jury, interest at the

maximum rate allowed by law from and after July 20, 2012, and for costs to the maximum extent permitted by law.

**PLAINTIFF DEMANDS A TRIAL BY A JURY OF AT LEAST SIX BUT NO MORE THAN TWELVE MEMBERS.**

Respectfully submitted,

HILLYARD, WAHLBERG, KUDLA,
SLOANE & WOODRUFF, LLP

*/s/ Daniel J. Caplis*
Daniel J. Caplis, of counsel
Stephen W. Wahlberg
Thomas G. Tasker
ATTORNEYS FOR PLAINTIFFS


Plaintiffs' Address:
c/o Hillyard, Wahlberg, Kudla, Sloane & Woodruff, LLP
4601 DTC Boulevard, Suite 950
Denver, CO 80237